**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH A. KAFKA and TODD KAFKA, <br> Plaintiffs, <br><br> vs. <br><br> WELLS FARGO SECURITIES, LLC <br> Defendant. | C.A. No. _____ |

## CLASS ACTION COMPLAINT

Plaintiffs, Joseph A. Kafka and Todd Kafka ("Plaintiffs"), allege the following based upon the investigation by Plaintiffs' counsel, which included, among other things, a review of the public documents and announcements made by LJM Funds Management, Ltd. ("LJM Management") and LJM Partners Ltd. (collectively "LJM Partners"); documents of record including all available pleadings concerning LJM Management, LJM Partners, and Defendant Wells Fargo Securities, LLC ("Wells Fargo"), and information readily available on the Internet. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     This is a class action brought by Plaintiffs individually on their own behalf and on behalf of a Class comprised of all persons who held: (1) shares of the LJM Preservation and Growth Fund (defined below) on February 5 and 6, 2018; or (2) limited partnership interests in any of the Partnership Funds (also defined below) on February 5 and 6, 2018 (the "Class Period").

2.     Plaintiffs allege that Wells Fargo caused them to suffer more than $500 million and as much as $800 million in realized losses when, without any right to do so, it forced the

immediate liquidation of their investments early in the morning on February 6, 2018, following a volatility sell-off on February 5, 2018.

3.      As alleged in more detail below, carrying out a plan it put in place in the midst of the volatility sell-off on February 5, 2018, Wells Fargo, in the early morning hours on February 6, 2018, wrongfully and without any right to do so ordered LJM to completely and immediately liquidate the Portfolio (defined below), which directly and proximately caused irreversible and devastating losses to the Plaintiffs and all other Class members of more than $500 million and as much as $800 million.  Shortly thereafter, Wells Fargo made a margin demand of $16.4 million on LJM, asserting the right to collect millions of dollars under the terms of an agreement it had previously terminated.

4.      Also as alleged herein, Wells Fargo acted precipitously, recklessly, irrationally, and unreasonably – and did so in a state of panic – in the midst and immediate aftermath of the volatility sell-off on February 5 and 6, 2018.  It did not act prudently, cautiously, thoughtfully, rationally, or reasonably.  Wells Fargo acted solely in its own best interest, and not in the best interests of the owners of or investors in the Portfolio.

5.      The claims asserted herein cannot be asserted by the Preservation Fund (defined below) or the Partnership Funds (also defined below) because they have been liquidated and terminated and no longer have capacity to bring these claims.

6.      In 2018, Wells Fargo brought an action against LJM Investment Fund, L.P., and LJM Partners, captioned *Wells Fargo Securities, LLC v. LJM Investment Fund, L.P., et al.*, No. 18-cv-02020 (LTS). On July 13, 2021, LJM and certain affiliated entities filed a Second Amended Answer and Counterclaims against Wells Fargo. LJM's counterclaims do not assert these claims on behalf of the Preservation Fund, the Partnership Funds, Plaintiffs, or the

members of the Class, and do not seek damages in that litigation to compensate Plaintiffs and the Class members fully for their enormous realized losses of more than $500 million and as much as $800 million.

## CERTAIN NON-PARTY ENTITIES

7.      The LJM Preservation and Growth Fund ("Preservation Fund") was a mutual fund that invested primarily in call and put options on Standard & Poor's 500 Futures Index ("S&P"). The Preservation Fund had three share classes, but all three classes had the same underlying portfolio of assets. The Preservation Fund traded under the ticker symbols LJMIX, LJMAX, and LJMCX.

8.      As a direct and proximate result of Wells Fargo's actions on February 6, 2018, the Preservation Fund was closed to new investors on February 7, 2018. The Preservation Fund was liquidated on March 29, 2018, and its remaining assets were distributed *pro rata* to all shareholders. All outstanding shares of the Preservation Fund were redeemed and cancelled, and the fund was dissolved.

9.      LJM Fund, L.P., PFC-LJM Preservation and Growth Fund, L.P., LJM Preservation and Growth Fund, L.P., and LJM Fund (collectively, the "Partnership Funds") were organized as Delaware limited partnerships and as commodity pools engaged in the trading of commodity futures, contracts, options on futures, and forward contracts on exchanges and markets in the United States. The Partnership Funds were subject to regulations of the Commodity Futures Trading Commission ("CFTC") and the Rules of the National Futures Association ("NFA").

10.     As a direct and proximate result of Wells Fargo's actions on February 6, 2018, the Partnership Funds terminated operations and were liquidated and were terminated and

dissolved beginning on or about February 28, 2018.

11.     Prior to their dissolution, LJM Partners, Ltd., ("LJM Partners") was the General Partner of LJM Investment Fund, L.P. ("LJM"), the commodity pool that conducted all the investment activities of the Partnership Funds.  LJM and LJM Partners are organized under the laws of the State of Illinois and at all material times maintained their principal place of business in Chicago, Illinois.  LJM was and is a registered commodity pool operator and commodity futures advisor with the CFTC.

12.     LJM Funds Management, Ltd. ("LJM Funds Management") was the investment advisor to the Preservation Fund and was responsible for managing the Partnership Funds' investments.  LJM Funds Management is a corporation organized under laws of the State of Illinois with its principal place of business in Chicago, Illinois.

13.     On February 6, 2018, Wells Fargo used its control over the Preservation Fund, the Partnership Funds, and LJM and wrongfully exercised  complete dominion and control over the assets of the Preservation Fund and the Partnership Funds (the "Portfolio" or the "Portfolio Assets").

14.     Plaintiffs and the members of the Class owned partnership or other interests in the Preservation Fund and the Partnership Funds and beneficial rights and interests in the Portfolio and its assets.

## PARTIES

15.     Plaintiff Joseph Kafka is an individual and resident of Collier County, State of Florida, who purchased and held an interest in LJM Fund, L.P. during the Class Period. On February 6, 2018, Joseph Kafka was one of the largest limited partners of LJM Fund, L.P.

16.     Plaintiff Todd Kafka is an individual residing in Lake County, State of Illinois,

who purchased and held securities in the Preservation Fund (ticker: LJMIX) and also purchased and held an interest in LJM Fund, L.P. during the Class Period. On February 6, 2018, Todd Kafka also was one of the largest limited partners of LJM Fund, L.P.

17.    Defendant Wells Fargo is a Delaware limited liability company that transacts substantial business in this judicial District, related to Plaintiffs and Class members.

## JURISDICTION AND VENUE

18.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the amount of $75,000 exclusive of interest and costs.

19.    The Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d) because at least one Class member is of diverse citizenship from Wells Fargo, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs.

20.    Venue is proper in this District under 28 U.S.C. §1391(b) because many of the acts complained of herein occurred or had their effect in this judicial District.

21.    At all material times, Wells Fargo had sufficient contacts within this judicial District and purposefully availed itself of benefits of this District so as to render the exercise of jurisdiction over it in this judicial District consistent with traditional notions of fair play and substantial justice.

## FACTUAL ALLEGATIONS

22.    During the Class Period, LJM bought and sold options contracts on the S&P 500 futures index. According to LJM, its investment objective was and is to deliver returns to Portfolio investors that would be uncorrelated with the overall performance of the U.S. equity

markets.

23.     The S&P 500 Index is a commonly used and quoted index of large capitalization U.S. stocks, often used to track overall performance of the U.S. equity market. It reflects the value of a basket of 500 commonly traded stocks, weighted by the capitalization of those stocks.

24.     The Chicago Mercantile Exchange ("CME") allows participants to trade S&P futures through contracts to buy or sell a specified future value of the index at a future date. For example, if the value of the S&P Index is currently 4400, a futures contract could set a future value of 4500 for three months ahead, *i.e.*, for "delivery" in May 2022. Market participants choose to "buy" or "sell" the futures contract based on their views on the likely future course of the stock market; in particular, whether such participants think the market is likely to trade higher or lower than the specified future level of the index on the specified future date.

25.     The S&P futures contract market is intended to be a cash market – *i.e.*, purchasers and sellers of the contracts are not expected to buy or deliver the full basket of stocks in the S&P 500, but instead to make or receive payment in cash on the specified date for their equivalent value.

26.     A single S&P 500 futures contract on the CME is valued at 250 times the value of the S&P 500 Index. The CME also offers an "E-MINI" futures contract, which is similar to a regular futures contract, except it is 1/5 the size of the regular S&P futures contract (50 times the value of the S&P index).

27.     Market participants also can buy or sell call or put options on S&P futures contracts. A call option is the right to purchase an S&P futures contract at a specified price (the "strike price") at or before a specified future time (the "expiry date"). A put option is the right to sell the S&P futures contract at the strike price on or before an expiry date.

28.    An options contract – including an options contract on S&P futures – can be "in" or "out" of the money. An "in the money" options is an option that if exercised today, would return a positive amount of money. An "out of the money" option is an option that if exercised today, would return zero or a negative return. The holder of an "out of the money" option can simply allow it to expire (and thus return zero). At any given time, an option holder can "lock in" existing gains or losses by exiting (selling out) of the position; alternatively, the holder can keep the option up until the expiry date.

29.    According to LJM, with only two exceptions, it only bought and sold options contracts on S&P 500 futures. On two occasions, LJM experimented with direct trades in S&P 500 futures contracts, both times with negative outcomes. Thereafter, LJM ceased trading in E-MINI futures.

30.    For more than two years before February 6, 2018, LJM claims it made no trades in any way utilizing E-MINI S&P futures contracts.

<u>LJM's Risk Management Techniques</u>

31.    Like many hedge funds, LJM took both "long" and "short" positions in the Portfolio to hedge against market risk – *i.e.*, the risk that equity markets would rise or fall. In LJM's case, that meant purchasing and selling both calls (options to buy at a specified price) and puts (options to sell at a specified price).

32.    LJM managed the short option positions such that at any given time, they were "out the money" – that is, if the current market price of the underlying S&P 500 future remained the same as of the option expiry date, the option would expire without being exercised, or without payment being required by either side of the contract.

33.    During periods of high volatility, the notional (or "paper") value of the Portfolio

could be temporarily affected. Throughout its existence, LJM experienced several high volatility events. When such events occurred, the notional value of the Portfolio declined temporarily, but LJM was able to implement effective risk management protocols to control risks and prevent or minimize actual losses from being realized.

34.     In particular, when volatility spiked, as it did on February 5, 2018, LJM would steadily close out positions over the course of the day, taking care to maintain the hedged nature of the portfolio – *i.e.*, balancing out its exit from both the "long" and "short" position in the Portfolio.

35.     Because volatility events are often very brief – lasting only hours – LJM's protocol protected the capital of the Portfolio while allowing for an orderly exit from trading positions if the event persisted.

36.     Over more than 20 years of managing risk, LJM successfully implemented these risk management protocols on several occasions. For example, in August 2011, LJM experienced notional losses as a result of then record-breaking increases in the VIX volatility index, including a 50% increase on August 8, 2011. The temporary paper losses ranged from -8.31% to 27.58%, but LJM later was able to recover fully from the volatility-related paper losses.

37.     To permit LJM to conduct its options trading, Wells Fargo entered into Futures and Cleared Swaps Agreements with LJM or its affiliates (the "FCM Agreements") under which Wells Fargo was only to provide certain clearing and execution services as a futures commission merchant to LMJ and its affiliates. A true and correct copy of one such FCM Agreement is attached hereto as Exhibit A.

38.     Section 24 of the FCM Agreements provided that the Agreements were terminable upon written notice by either party. In the event of such a termination, LJM had the

option of "promptly" closing out open trades *or* transferring all open positions to another FCM.

39.     The FCM Agreements do not define the word "promptly." However, in this context, the term "promptly" is a commonly understood term-of-art in the industry. Consistent with Rule 2-27 of the National Futures Association, the term "promptly" means the approximately two business days typically required to effectuate a transfer of accounts from one FCM to another.

40.     In the language and structure of the FCM Agreements, the parties clearly intended to use the standard industry meaning of the term "promptly," to establish the timeframe for LJM to effectuate the close out or transfer of open trading positions. The parties could not have intended "promptly" to mean "immediately" because that would render it practically impossible to accomplish a transfer of the account to another FCM, a right the FCM Agreements specifically reserve.

41.     In addition, while § 24 of the FCM Agreements requires LJM either to close out or transfer its open positions upon termination, it does not confer upon Wells Fargo the right to direct LJM to conduct any specific trades to achieve that end.

LJM Faces a Volatility Event

42.     On Monday, February 5, 2018, the stock market declined as the volatility index rose, creating instability in the options market caused by a combination of market concentration and hedge and leverage rebalancing, culminating in a spike in the "VIX," an index reflecting market volatility.

43.     At the time of the volatility event on February 5, 2018, LJM claims in its litigation against Wells Fargo that the Portfolio consisted entirely of options positions on S&P 500 futures. LJM claims that the Portfolio did not hold any direct positions – either long or short

– in S&P 500 futures contracts, including any E-MINI contracts.

44.    The market conditions on February 5, 2018, resulted in notional losses on LJM's open options positions. However, these losses primarily were unrealized paper losses. In response, LJM traded actively to rebalance the portfolio and offset risk.

45.    In the afternoon on February 5, 2018, LJM began executing risk-reducing trades following its usual protocol.  However, those trades were not fully processed by the executing brokers and were not reflected in statements of LJM's accounts with Wells Fargo that day.

46.    LJM suffered significant unrealized losses on February 5, 2018. However, if market conditions recovered (as they did by the afternoon of February 6, 2018), LJM was well-positioned to recover much of the paper losses it had suffered, and even to make a substantial profit. If the market conditions deteriorated, LJM was in the best position to limit the scope of the losses by implementing its tried-and-tested risk management protocol for such events. Unfortunately, all those well-laid plans went awry due to the precipitous and unlawful interference by Wells Fargo.

47.    On or about February 5, 2018, LJM informed Wells Fargo of numerous risk-reducing trades that had not yet been processed, which LJM had made to protect the Portfolio.

48.    Wells Fargo knew and acknowledged that its own record of the accounts was inaccurate and incomplete and did not reflect the significant reduction of risk exposure that LJM accomplished that day.

49.    While Plaintiffs and the other Class members suffered some unrealized paper losses on certain of their investments in the Portfolio on February 5, 2018, Wells Fargo understood the VIX spike was an anomalous temporary event. Wells Fargo knew that if the markets stabilized or recovered (as they did on February 6, 2018), LJM was well positioned to

avoid or recover most of the unrealized paper losses.

50.    LJM advised Wells Fargo that if the market changed, LJM was in the best position to contain and manage the scope of the losses for the Plaintiffs and other Class members who held substantial interests in the Portfolio to avoid realizing losses of more than $500 million and as much as $800 million for Plaintiffs and the other Class members.

<u>Wells Fargo Inflicts Massive Losses on Plaintiffs and the Class</u>

51.    On the evening of February 5, 2018, Wells Fargo sent out a position statement and margin request for the Preservation Fund. In its litigation against Wells Fargo, LJM claims that based on the positions it actually held after the close of trading on February 5, 2018, LJM had more than sufficient funds available in its cash account at Union Bank to cover the margin requirements. LJM had often wired funds from Union Bank for this very purpose in the past.

52.    Wells Fargo's statement and accompanying margin request was supposed to reflect the true state of the Portfolio. However, Wells Fargo's end-of-day position statement was inaccurate and failed to incorporate risk-reducing trades LJM made that afternoon. Wells Fargo knew that its statement was based upon materially incomplete and incorrect information, but nonetheless demanded exorbitantly high margin deposits based upon this admittedly inaccurate information.

53.    Under the terms of the FCM Agreements, margin deposits were not due until the end of the next trading day (*i.e.*, on February 6, 2018). Thus, on the morning of February 6, 2018, LJM was still in full compliance with its obligations under the Agreement, regardless of how the margin requirements were calculated.

54.    Nonetheless, at around 6:00 a.m. on February 6, 2018, hours before the markets opened, Wells Fargo contacted LJM by phone and impetuously and recklessly terminated its

position as FCM for the Preservation Fund and the Partnership Funds. Wells Fargo immediately

ordered and orchestrated the immediate liquidation of the entire Portfolio without any legal right

to do so.

55.    Wells Fargo's phone call was followed by a formal letter, which it had written on

February 5, 2018, and sent to LJM Fund, L.P. at its offices in Chicago, Illinois at 7:36 a.m. on

February 6, 2018, expressly terminating the FCM Agreements for its convenience, purportedly

as of right under § 24 of the FCM Agreements. However, Wells Fargo did not invoke an "Event

of Default" under § 19 of the FCM Agreements or give any other basis for its termination. A true

and correct copy of the termination letter is attached hereto as Exhibit B.

56.    Contrary to the terms of the FCM Agreements, which permit LJM a fair and full

opportunity to transfer its positions to another FCM or close them out in an orderly manner, early

in the morning of February 6, 2018, Wells Fargo ordered and demanded that LJM immediately

liquidate the entire Portfolio.

57.    Instead of permitting LJM to manage the liquidation of the Portfolio in an orderly

fashion or afford a reasonable opportunity to transfer the positions to another FCM, in breach of

the Agreements, Wells Fargo recklessly forced LJM to wholly liquidate the Portfolio in a

commercially unreasonable manner. Among its other unlawful conduct, Wells Fargo also rashly

forced LJM to enter into short sales of futures that LJM did not hold or own.

58.    When Wells Fargo demanded and directed that LJM immediately liquidate the

entire Portfolio early in the morning of February 6, 2018, hours before the markets opened, in the

midst of the volatility spike, Wells Fargo acted on its own behalf, in furtherance of its own

interests, and not at the instruction of LJM or for the benefit of LJM or for the benefit of

Plaintiffs and the other members of the Class.  Nor was Wells Fargo acting in its purported

capacity as agent of LJM.

59.     In ordering and demanding that LJM immediately liquidate the Portfolio early in the morning on February 6, 2018, Wells Fargo acted on its own initiative and was not executing or clearing any trading instruction from LJM. Nor did Wells Fargo do so in its purported capacity as agent of LJM.

60.     Wells Fargo took those actions early in the morning on February 6, 2018, without any legal authority or right to order or direct the immediate liquidation of all of the interests held by Plaintiffs and the other Class members in the Portfolio.

61.     Wells Fargo took these precipitous and unlawful actions although it knew they were based upon false and incomplete information concerning the content of the Portfolio, and although Wells Fargo knew the true risk level in the Portfolio already had been substantially reduced. None of LJM's three other futures commission merchants, F.C. Stone, Bank of America/Merrill Lynch, or RBC, terminated their FCM agreements with LJM or ordered LJM to liquidate any of its positions.

62.     When Wells Fargo terminated its FCM Agreements early in the morning on February 6, 2018, LJM was contractually entitled to the option of "promptly" closing out open trades *or* "promptly" transferring all open positions to another FCM in a reasonable manner.

63.     By demanding and orchestrating the immediate liquidation of the Portfolio Assets early in the morning on February 6, 2018, hours before the markets even opened, Wells Fargo denied LJM its contractual right to "promptly" close out all open trades or "promptly" transfer all open positions to another FCM in a reasonable manner.

64.     Wells Fargo had reason to take the precipitous actions it took on February 5 and 6, 2018, in the midst of the declining market conditions which had the immediate effect of

imposing enormous realized losses on Plaintiffs and the Class.

65.     After receiving the notice from Wells Fargo, LJM claims in its litigation against Wells Fargo that it had every intention of carrying out its responsibilities under § 24 of the FCM Agreements. In particular, LJM planned to carry out its tested liquidation and risk management procedures to wind down the portfolio in a steady and orderly fashion, or else to transfer some or all of the positions to another FCM.

66.     Had Wells Fargo given LJM sufficient time to act, LJM claims in its litigation against Wells Fargo that it could have sought to transfer its positions to one of its other brokers. Alternatively, left to its proper devices, as required under the FCM Agreements, LJM claims it could have conducted an orderly exit from its options positions by the end of the trading day on February 6, 2018.

67.     Wells Fargo, however, demanded and directed an immediate forced liquidation of all of LJM's positions before the markets even opened, using trading mechanisms prescribed by Wells Fargo. Due to these improper directions and demands by Wells Fargo, in violation of § 24 of the FCM Agreements, LJM was never given the opportunity to wind down its positions in a steady and orderly manner or to transfer the Portfolio Assets to another FCM, as was its right under the FCM Agreements.

68.     Wells Fargo did not merely demand and direct that LJM liquidate its existing, open options positions. Rather, Wells Fargo also instructed LJM to conduct an immediate bulk "short" sale of E-MINI S&P 500 futures (the "E-MINI futures").

69.     Contrary to the FCM agreement, Wells Fargo improperly asserted complete authority to act and control the Portfolio, in which Plaintiffs and the other Class members held partnership and beneficial interests.

70.    LJM did not own or hold any "long" E-MINI futures positions, or any other S&P futures positions. Thus, Wells Fargo was giving the extraordinary direction to short sell futures positions that LJM did not own, and did so in reckless disregard for the interests of Plaintiffs and the Class members.

71.    Wells Fargo's order to short sell the E-MINI futures was not based upon a considered evaluation that such transactions were an appropriate way to unwind the LJM portfolio. Wells Fargo's account professionals did not know how to unwind the Portfolio in an appropriate manner to control risk. They were, however, apparently familiar with the common E-MINI futures contract and knew that trades in those contracts could be executed quickly and in large volumes.

72.    Thus, Wells Fargo's professionals ordered LJM to conduct massive short sales of E-MINI futures, even though the short sales could devastate the capital value of the Portfolio.

73.    LJM claims in its litigation against Wells Fargo that it never would have short sold E-MINI futures on its own accord. Indeed, LJM claims the P&G Fund (the largest LJM fund held at Wells Fargo) *never* traded E-MINI futures in its entire eight-year history.

74.    Selling futures contracts directly (like E-MINI futures) can be a way of offsetting put option positions of the sort held by LJM in part of its overall portfolio. But Wells Fargo knew or should have known that doing so is an extremely dangerous and unadvisable way to unwind an options portfolio like that held by LJM. Thus, trading E-MINI futures before the markets open on February 6, 2018, reasonably would be expected to have a catastrophic effect.

75.    Moreover, in the hours before the market opened on February 6, 2018, the relatively illiquid after-hours market had extreme and unusual spreads between futures and cash markets. Any experienced market professional, however, would have been aware that price

movements in the after-hours market were not reliable sources of market information, given the highly illiquid trading conditions in that market.

76.    In this context, selling S&P futures on February 6, 2018, without waiting for the market to open and adjust, would immediately realize and lock in massive unrealized paper losses from the prior day. At the same time, selling E-MINI futures also would recklessly unbalance the Portfolio, exposing Plaintiffs and the Class members to further brutal losses should the market correct and stabilize, which it did only hours later that same morning.

77.    Wells Fargo knew the effect of trading E-mini futures before the market opened on February 6, 2018, reasonably would be expected to have a catastrophic and uniform effect upon Plaintiffs and all class members. In the hours before the market opened, the relatively illiquid after-hours market had extreme and unusual spreads between futures and cash markets.

78.    Wells Fargo knew that selling futures, without waiting for the market to open and adjust, would immediately realize and lock in brutal unrealized paper losses to the Portfolio for the Plaintiffs and all class members from the prior day. At the same time, Wells Fargo also knew that selling E-MINI futures would recklessly unbalance the Portfolio, thus exposing the entire Portfolio, Plaintiffs and all Class members to further irreversible, losses when the market corrected and stabilized (which it did only hours later on February 6, 2018).

79.    In the absence of Wells Fargo's improper conduct, LJM would not have traded the Portfolio Assets as directed by Wells Fargo.

80.    Wells Fargo's message to LJM in the early morning hours on February 6, 2018, was loud and clear: if LJM did not carry out the E-MINI futures trades, Wells Fargo would simply seize control of the Portfolio and conduct the liquidating trades itself.

81.    To enforce its demand – and to drive home that Wells Fargo and not LJM was in

control of the disposition of the Portfolio Assets on the morning of February 6, 2018 – Wells Fargo sent two of its own employees to LJM's offices in Chicago, Illinois to direct, oversee, and report on LJM's compliance with Wells Fargo's demands. The Wells Fargo employees arrived at LJM's offices in Chicago before the markets open and stayed there through the end of the day, constantly monitoring and reporting to Wells Fargo on LJM's activities and continuously exercising complete dominion and control and providing directives to LJM, resulting in Plaintiffs and all other Class members suffering irreversible, catastrophic losses on that day.

82.    Wells Fargo also failed to exercise industry standards of due care.  Its employee representatives were not trained in a sufficient manner consistent with industry standards, and Wells Fargo's conduct resulted in an immediate and irreversible wrongful liquidation of all the Portfolio Assets.

83.    LJM's fears concerning Wells Fargo's misguided prescription quickly were realized. The sale of E-MINI futures resulted in massive losses to the portfolio, even before the options markets opened. In addition, the sale left the overall portfolio dangerously unbalanced. As explained, in the ordinary course of business, LJM carefully hedged its book: it sold both put options (betting against a market fall) and call options (betting against a market rise). The rapid sale of E-MINI futures had the effect of closing out the open put option positions, while leaving the call option positions open and intact. This left LJM wholly exposed if the markets stabilized or recovered, a typical development on the day after an anomalous market move.

84.    Although the market did stabilize and recover by mid-morning on February 6, 2018, by 11:00 a.m., Wells Fargo directed LJM to cease trading E-MINI futures. However, by then the damage was irreversible. The put side of LJM's book had been unwound, and the best that LJM could do was to attempt to limit the damage suffered by Plaintiffs and the other Class

members on the now completely unhedged Portfolio.

85.    By the end of the trading day on February 6, 2018, (3:15 p.m.), per Wells Fargo's untimely unauthorized and self-interested instructions, LJM had completely unwound the Portfolio with disastrous results and catastrophic losses to the Plaintiffs and all Class members, losing more than $500 million and as much as $800 million in the Portfolio. LJM claims in its litigation against Wells Fargo that approximately $90 million alone resulted from the unlawful sales of E-MINI futures trades directed by Wells Fargo.

86.    If Wells Fargo had not ordered an immediate, complete liquidation in less than 5 hours, but simply maintained the positions it had on the morning of February 6 or had allowed LJM to exercise its right to transfer open positions to another FCM, LJM contends that the Portfolio would have been up by approximately 10%, instead of suffering irreversible, complete destruction. LJM further avers that had it been allowed to carry out its practiced risk containment procedures, Plaintiffs and all class members would not have incurred the realized losses of more than $500 million and as much as $800 million they have suffered.

87.    If LJM had not been forced to liquidate the Portfolio, but consistent with § 24 of the FCM Agreements, simply transferred the positions it had on the morning of February 6th to another FCM, LJM's accounts would have been up by 10% later that same day.

88.    Alternatively, absent Well Fargo's interference, LJM could have carried out its own portfolio wind down procedures, with the intent of closing out or transferring its positions in an orderly fashion. If LJM had carried out these well-practiced risk containment procedures, it could have experienced some losses, but far less than those actually incurred.

89.    Instead, by the end of the trading day (3:15 p.m.), per Wells Fargo's instructions, LJM had completely unwound the Portfolio with disastrous results, losing more than $500

million and as much as $800 million in realized trading losses for Plaintiffs and the other Class members.

<u>Wells Fargo "Rescinds" Its Termination the Same Day</u>

90.    During the day on February 6, 2018, as Wells Fargo forced the liquidation of the Portfolio, Wells Fargo came to realize that its termination under § 24 of the FCM Agreements eliminated many of the remedies Wells Fargo previously had under the Agreements before terminating them, such as the right to demand margin. The termination also eliminated the parties' prior disclaimer of Wells Fargo's fiduciary duties and any contractual limitation on Wells Fargo's liability.

91.    Thus, having irrevocably terminated the FCM Agreements – and after causing LJM to liquidate the Portfolio Assets to the extreme detriment of Plaintiffs and the other Class members – Wells Fargo abruptly reversed course and purported to unilaterally "reinstate" its former contractual rights. Undoubtedly, Wells Fargo hoped that doing so would help it avoid responsibility for the Portfolio's massive losses Plaintiffs and the other Class members realized that day.

92.    Just two minutes after the close of trading on February 6, 2018, after Wells Fargo's precipitous and self-interested actions before the trading day began caused Plaintiffs and the other Class members to realize catastrophic losses, and in the utmost bad faith, Wells Fargo then sent its letter to LJM purporting to "rescind" its termination notice from earlier that morning and to "reinstate" the Agreements – in effect, reversing the very basis upon which it premised the involuntary liquidation of the Portfolio Assets – even though there were no open positions remaining in the Portfolio after Wells Fargo forced the liquidation.

93.    Although Wells Fargo lost its right to demand margin after terminating the FCM

Agreements, on February 8, 2018, Wells Fargo purported to make a margin call upon LJM in the amount of $16.4 million.

## **TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION**

94.     Despite their exercise of reasonable due diligence, Plaintiffs and proposed class members could not reasonably have discovered the facts constituting Wells Fargo's violations of law before September 20, 2019. In fact, Wells Fargo, with the intent to defraud, has never disclosed any of the material facts set forth in this Complaint to Plaintiffs or class members.

95.     To the contrary, Wells Fargo has continued to fraudulently conceal the facts including as to how it forced the wrongful liquidation upon LJM through the present date. Plaintiffs learned of some of the actions of Wells Fargo on or after September 20, 2019, through their due diligence and independent investigation, which is continuing. Plaintiffs have retained counsel to pursue this action against Wells Fargo for the catastrophic losses sustained by Plaintiffs and the Class members of more than $500 million and as much as $800 million.

96.     Plaintiffs and the Class members could not reasonably have discovered the facts constituting Wells Fargo's conduct and violations of law before September 20, 2019. Wells Fargo has never disclosed and has fraudulently concealed its conduct from Plaintiffs and class members through the present date.

97.     Many of the facts alleged herein were not disclosed until on or after September 20, 2019, when LJM filed a proposed amended counterclaim in its litigation against Wells Fargo, including:

> a.  that Wells Fargo demanded and recklessly coerced LJM into the complete liquidation of the Portfolio Assets despite the fact that LJM had the capacity to execute risk-reducing trades on February 6, 2018, that

would have eliminated or substantially reduced the risk of realized

losses;

b.  that Wells Fargo forced LJM to execute the liquidation of the Portfolio

and the trades, including ordering LJM to execute massive short sales of

E-MINI futures that LJM did not own;

c.  that LJM ordered the complete liquidation of the Portfolio upon the

explicit threat that Wells Fargo otherwise would seize control of the

Portfolio Assets and conduct the liquidating trades itself;

d.  that LJM previously executed similar risk-reducing trades during similar

market instability events that eliminated or substantially reduced the risk

of realized losses;

e.  that LJM maintained a risk-balanced investment strategy in the Portfolio;

f.  that Wells Fargo knew of LJM's risk-balanced investment strategy and

knew that LJM maintained a risk-balanced investment strategy in the

Portfolio;

g.  that Wells Fargo sent two employees to LJM's offices before the markets

opened on February 6, 2018, who remained there throughout the day to

enforce its demand and direction that LMJ completely and immediately

liquidate the Portfolio in the early morning hours on that date;

h.  that Wells Fargo prepared its letter purporting to terminate the FCM

Agreements on February 5, 2018;

i.  that Wells Fargo did not claim an event of default by LJM when it

purported to terminate the FCM Agreements in the early morning hours

on February 6, 2018;

j.   that Wells Fargo admitted in its Answer to LJM's Second Amended
     Counterclaim that it attempted to rescind its termination of the FCM
     Agreements later in the afternoon on February 6, 2018, which was after
     the Portfolio had been completely liquidated; and

k.   that LJM does not assert the claims Plaintiffs assert herein or any other
     claims on behalf of the Preservation Fund, the Partnership Funds,
     Plaintiffs, or the members of the Class, and it does not seek damages
     sufficient to compensate Plaintiffs and the Class members fully for their
     enormous realized losses, does not seek punitive damages, and did not
     demand a jury trial.

98.     In addition, to exercise due diligence so that Plaintiffs could attempt to investigate
the facts, the Plaintiffs entered into a tolling agreement, with defendant, Wells Fargo through the
summer of 2021.

99.     Wells Fargo has willfully failed to provide and/or disclose the facts concerning its
wrongful liquidation and conduct to the Plaintiffs and class members through the present date.

100.    Further, because Plaintiffs and all class members could not have reasonably
discovered the facts constituting Wells Fargo's violations of law until recently in 2021, their
claims accrued in 2021 and any applicable statutes of limitations have been tolled until the
present date.

101.    By virtue of Wells Fargo's conduct and its failure to disclose its egregious conduct
surrounding the liquidation, Wells Fargo is also equitably estopped from relying on any
applicable statutes of limitations as a defense to this action.

## CLASS ACTION ALLEGATIONS

102.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class:

     a.    all persons and entities who had purchased or otherwise acquired shares in the Preservation Fund and held such shares on February 5 and 6, 2018 (the "Preservation Fund Sub-Class");

     b.    all persons and entities who had purchased or otherwise acquired partnership interests in the Partnership Funds and held such interests on February 5 and 6, 2018 (the "Partnership Funds Sub-Class");

Excluded from the Class and the Sub-Classes are Wells Fargo, its affiliates and subsidiaries, and all directors and officers thereof, LJM and any related entities, and all directors and officers thereof, and their immediate families.

103.    The Class easily satisfies the requirements of Rule 23(a), as well as 23(b)(1)(B) and (b)(3). Wells Fargo's conduct was uniform as to Plaintiffs and all members of the Class.

104.    <u>Numerosity</u>. The members of Class are so numerous that joinder of all members is impracticable. The size of Class, which is estimated to include thousands of Class members, can only be ascertained through discovery.

105.    <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Wells Fargo's uniform conduct as to the Portfolio, and its forced liquidation of the same, in which Plaintiffs and all Class members held ownership interests.

106.    <u>Adequacy.</u> Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation, and securities and commodities related litigation.

107.    <u>Commonality.</u> Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the class include:

    a.   whether Wells Fargo breached its duties to the Plaintiffs and the members of the Class;

    b.   whether Wells Fargo is liable to the Plaintiffs and the other Class members for forcing the immediate liquidation of the entire Portfolio after giving notice of termination for its own interest and not at the instruction or direction of LJM or for the benefit of Plaintiffs and the other members of the Class, and otherwise causing irreversible losses to Plaintiffs and the other Class members;

    c.   whether Wells Fargo had a legal right to force the immediate liquidation of the Portfolio early in the morning on February 6, 2018;

    d.   whether Wells Fargo is liable to Plaintiffs and the Class members for gross negligence, fraud, tortious interference with contractual relations, tortious interference with business relations, breach of contract and negligent supervision and the breach of implied covenant of good faith and fair dealing as alleged herein; and

    e.   whether Plaintiffs and the Class members are entitled to compensatory damages due to Wells Fargo's willful conduct and, if so, what measure of damages is proper;

    f.   whether Plaintiffs and the Class members are entitled to punitive or exemplary damages and, if so, what measure of damages is proper.

108.    <u>Predominance and Superiority.</u> The questions of law and fact common to the

Class members predominate over any questions affecting only individual members. A class action under Rule 23(b)(3) is also superior to all other available methods for the fair and efficient adjudication of this controversy.

109.    Because the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for Plaintiff and the members of the Class to individually redress the wrongs done to them. There will be no unusual difficulty in the management of this action as a class action.

**COUNT ONE**
**GROSS NEGLIGENCE**

110.    Plaintiffs incorporate by reference the foregoing allegations as contained in paragraphs 1 through 109 as if fully set forth herein.

111.    It was reasonably foreseeable that Plaintiffs and the Class members, as investors in the Portfolio and owners of Portfolio Assets, would be injured by any adverse action taken with respect to the Portfolio or the investments in the Portfolio. Thus, Wells Fargo owed a duty of care to Plaintiffs and all Class members.

112.    Wells Fargo engaged in a willful and wanton course of misconduct.

113.    Wells Fargo engaged in bad faith and malfeasance when it ordered the sale of E-MINI futures, and forced the wrongful liquidation of the Portfolio.

114.    Wells Fargo's actions constituted an extreme departure from applicable industry standards, including but not limited to ordering of the immediate massive short sale of E-MINI futures.

115.    Wells Fargo was responsible for preserving the safety and security of monies, securities, and property that Plaintiffs and the members of the Class paid, delivered, and entrusted to Wells Fargo with respect to their interests in the Portfolio Assets.

116.     Wells Fargo knew that the Plaintiffs imposed special trust and confidence in Wells Fargo, who was in a position of superiority and control over Plaintiffs' and the Class members' interests.

117.     Wells Fargo did in fact exercise complete dominion and control over the Portfolio and Plaintiffs' interests therein, and it was charged with the duty and responsibility to implement and comply with all rules and procedures to maintain such property and collateral and to ensure that those assets were not used, sold, applied, or liquidated for any improper purpose, including the self-interests of Wells Fargo or its affiliates to the extreme detriment of Plaintiffs and members of the Class.

118.     As such, Wells Fargo owed Plaintiffs and the members of the Class a duty to preserve and protect their customer funds and property and collateral to preserve these assets and to act solely in their best interests in connection with Wells Fargo's custody and control of their assets, and to avoid any self-dealing or conduct on behalf of Wells Fargo to the detriment of Plaintiffs and the members of the Class.

119.     Wells Fargo was grossly negligent and breached its duties owed to Plaintiffs and the other members of the proposed class by, among other things, intentionally, knowingly, recklessly, willfully, or gross negligently:

     a.    directing, authorizing, and causing the untimely, irreversible liquidation of the Portfolio for the benefit of Wells Fargo and its affiliates;

     b.    ordering and directing the sale of E-MINI futures; and

     c.    employing irreversible procedures which had the foreseeable effect of resulting in catastrophic losses to Plaintiffs and the Class members.

120.     Wells Fargo was on actual or inquiry notice that the liquidation and forced sale of

funds including E-MINI futures and collateral funds and its direction of the wrongful liquidation would have catastrophic consequences to Plaintiffs and the members of the Class.

121.    The Defendant knowingly breached its legal duties to Plaintiffs and the Class members, by among other things:

      a.  failing to exercise due diligence concerning the Portfolio Assets and Plaintiffs' and the other Class members' interests therein;

      b.  failing to provide advance notice to Plaintiffs and class members in order to prevent the untimely and irreversible liquidation of the Portfolio;

      c.  causing and ordering customer assets and collateral to be untimely and recklessly liquidated for the self-interest and benefit of Wells Fargo to the extreme detriment of Plaintiffs and the other Class members.

122.    As a direct, proximate, and foreseeable consequence of the gross negligence of Wells Fargo, as alleged herein, Plaintiffs and other members of the Class have lost virtually all of their money, securities, and property in the Portfolio and have been damaged thereby in an amount to be determined by a jury at trial.

## COUNT TWO
## FRAUD

123.    Plaintiffs incorporate by reference the foregoing allegations as contained in paragraphs 1 through 109 above as if fully set forth herein.

124.    It was reasonably foreseeable that Plaintiffs and the Class members, as investors in the Portfolio and owners of Portfolio Assets, would be injured by any adverse action taken with respect to the Portfolio or the investments in the Portfolio. Thus, Wells Fargo owed a duty of care to Plaintiffs and all Class members, including the duty to act honestly with respect to Plaintiffs and all Class members.

125.    With the intent to deceive, Wells Fargo exercised complete dominion and control over the Portfolio and ordered and enforced its liquidation in a matter of several hours. It failed to disclose to Plaintiffs and to other members of the Class the material facts known to Wells Fargo as set forth herein, including that Wells Fargo had ordered the sale of E-MINI futures and intended to force the immediate and entire liquidation of the Portfolio in the early morning hours on February 6, 2018.

126.    Wells Fargo had a legal duty to the Plaintiffs and members of the proposed Class to alert them and disclose its actions because it had superior knowledge of the referenced material facts concerning its ordering of the wrongful liquidation, in only a matter of hours, and because its actions of February 6 were irreversible and would likely result in irreparable injury and catastrophic losses to Plaintiffs and the Class.

127.    In addition, Plaintiffs and the members of the Class imposed trust and confidence in Wells Fargo to disclose its actions and to do so prior to engaging in its wrongful liquidation which would irreparably harm the Plaintiffs and the members of the Class.

128.    Wells Fargo was in a position of influence, dominion, superiority, and control over the Portfolio and the interests of Plaintiffs and the other members of the Class in the Portfolio and exercised same.

129.    Wells Fargo's actions, had they been timely disclosed, would have been material to Plaintiffs and the other members of the proposed Class and alerted them such that they could act and mitigate their damages. The facts known to Wells Fargo, stated above and throughout the complaint, substantially impacted and affected the financial interests of the Plaintiffs and the other members of the Class, and Wells Fargo knew the non-disclosure of that knowledge would result in the Plaintiffs and other members of the Class sustaining hundreds of millions of dollars

in losses, which were preventable and could have been avoided.

130.    By virtue of Wells Fargo's knowledge of the facts stated throughout this complaint, it knew that Plaintiffs and other members of the Class would not have expected Wells Fargo to take such actions, which were irreversible. Wells Fargo acted with scienter and alternatively, with reckless disregard for the rights and interests of Plaintiffs and all other Class members.

131.    Wells Fargo, for its own self-motivated interests, acted with a fraudulent intent to deceive Plaintiffs and other members of the Class.

132.    Wells Fargo knew the foreseeable consequences of: (a) its misappropriation and conversion of Plaintiffs interests; (b) its failure to timely disclose its actions to the Plaintiffs and class members; and (c) its failure to warn the Plaintiffs and other members of the proposed Class, which would completely preclude them from protecting themselves or mitigating their losses.

133.    Plaintiffs and the other Class members acted in reasonable and justifiable reliance on Wells Fargo's failure to act in good faith and fraudulent failure to disclose its conduct of February 6, 2018.

134.    As a result of Wells Fargo's fraudulent actions, Plaintiffs and other members of the Class were unable to prevent the catastrophic losses.

135.    Plaintiffs and other members of the Class acted in a manner consistent with how a reasonably prudent person in their position would have acted, particularly given (i) their lack of access to the immediate and fraudulent actions of Wells Fargo; (ii) Wells Fargo's fraudulent concealment of its activities, course of conduct and bad faith; (iii) Plaintiffs' inability to detect the fraud, and (iv) the nature of the omitted disclosure of Wells Fargo's course of action.

136.    Had Wells Fargo timely disclosed the material information to Plaintiffs and the

other members of the Class, they would have been able to take action to mitigate their losses and would not have suffered the irreversible, catastrophic losses, which would have been preventable.

137. As a direct and proximate result of Wells Fargo's fraudulent conduct and failure to disclose its conduct, Plaintiffs and the other members of the Class suffered irreversible losses.

138. Wells Fargo also knew the Partnership Funds invested by Plaintiffs were regulated funds, which raised specific regulatory requirements concerning the management, handling, and liquidation of those funds.

139. Wells Fargo knew that it was not permitted to order and direct the sale of previously non-existent E-MINI futures in its account and convert the Portfolio Assets which were not pre-existing collateral.

140. Because Wells Fargo knew that the Portfolio Assets were intended for investment, preservation, and security, Wells Fargo was well aware of the regulatory restrictions concerning such accounts, and their liquidation. Wells Fargo also knew that it was subject to certain regulatory requirements concerning account liquidation and compliance with all regulatory requirements.

141. Wells Fargo had a duty to Plaintiffs and other members of the Class to safeguard the Portfolio Assets.

142. Wells Fargo breached its duty to Plaintiffs and the other Class members in the manner described above and below, as follows:

      a.  it failed to exercise reasonable due diligence concerning the Portfolio and the interests of Plaintiffs and the other members of the Class;

      b.  it failed to implement and adhere to regulatory compliance, monitoring, and

liquidation protocols concerning the Portfolio and interests of Plaintiffs and other members of the Class;

c.   it failed to employ adequate risk mitigation techniques in a reasonable and timely manner and prevented LJM, Plaintiffs and class members from doing so.

d.   it failed to timely notify Plaintiffs, other members of the proposed class, the CFTC, or any governmental regulators about Wells Fargo's scheme to involuntarily liquidate Plaintiffs and Class members' funds for its own self-interests, and without the legal right to do so; and

e.   it caused the assets of Plaintiffs and the other Class members to be liquidated for the benefit of Wells Fargo through its directives to LJM.

143.    As a direct, proximate, and foreseeable consequence of the Wells Fargo's fraudulent conduct as described throughout this complaint, Plaintiffs and the other members of the Classe have lost more than $500 million and as much as $800 million. Plaintiffs have been damaged thereby in an amount to be determined by a jury at trial.

144.    The harm suffered by Plaintiffs and the members of the Class was the foreseeable result of Wells Fargo's fraudulent conduct and was preventable, but for Wells Fargo's deliberate conduct.

145.    In addition, Plaintiffs and the Class are entitled to punitive damages because Wells Fargo acted maliciously and in bad faith in deliberate or reckless disregard of Plaintiffs' and the other Class members' rights.

**COUNT THREE**
**TORTIOUS INTERFERENCE WITH**
**CONTRACTUAL RELATIONS**

146.    Plaintiffs incorporate by reference the foregoing allegations as contained in paragraphs 1 through 109 as if fully set forth herein.

147.    Plaintiffs and the Class members entered into valid and enforceable subscription contracts with LJM to manage the Portfolio Assets, which required LJM to act prudently, reasonably, and responsibly for their best interests.

148.    Wells Fargo knew and was aware of the contractual agreements and obligations LJM owed to Plaintiffs and the other Class members.

149.    Wells Fargo, intentionally and without justification, induced LJM to breach its contractual duties to Plaintiffs and the Class members.

150.    Wells Fargo, intentionally and without justification, induced a breach of contract when it forced the wrongful liquidation and sale of all Plaintiffs' and the Class members' interests in the Portfolio Assets.

151.    As a direct, proximate, and foreseeable result of Wells Fargo's tortious interference with contractual relations, breach and wrongful conduct, Plaintiffs and the Class members have suffered substantial losses and irreparable injury.

152.    In addition, Plaintiffs and the Class members are entitled to punitive damages because Wells Fargo acted maliciously and in bad faith in deliberate or reckless disregard of Plaintiffs' and the other Class members' rights.

**COUNT FOUR**
**TORTIOUS INTERFERENCE**
**WITH BUSINESS RELATIONS**

153.    Plaintiffs incorporate by reference the foregoing allegations as contained in paragraphs 1 through 109 as if fully set forth herein.

154.    Wells Fargo knew that virtually all the proceeds from the Subscription Agreements were deposited and maintained, including with Wells Fargo and constituted the Portfolio.

155.    Wells Fargo knew that the funds were received for the purpose of trading regulated futures contracts and segregated pursuant to CFTC regulations.

156.    Plaintiffs and the Class members entered into valid and enforceable business relationships with LJM Fund, L.P. and the entities whose investors were invested in the Portfolio.

157.    Wells Fargo knew and was aware of the business relations and obligations between Plaintiffs, the Class members, and LJM Fund, L.P. and the entities whose investors were invested in the Portfolio.

158.    Wells Fargo, intentionally and without justification, induced a breach of the business relationships between Plaintiffs, the Class members, and LJM Fund, L.P. and the entities whose investors were invested in the Portfolio.

159.    Wells Fargo, intentionally and without justification, induced a breach of the business relationships when it forced the complete liquidation and sale of the Portfolio and all of Plaintiffs' and the Class members' interests in the Portfolio.

160.    As a direct, proximate, and foreseeable result of Wells Fargo's tortious interference with business relations between Plaintiffs and all Class members and LJM Fund, L.P. and the entities whose investors were invested in the Portfolio, Plaintiffs and the Class members suffered substantial losses and irreparable injury.

161.    In addition, Plaintiffs and the Class members are entitled to punitive damages because Wells Fargo acted maliciously and in bad faith in deliberate or reckless disregard of Plaintiffs and the other Class members' rights.

**COUNT FIVE**
**<u>NEGLIGENT SUPERVISION</u>**

162.    Plaintiffs incorporate by reference the foregoing allegations as contained in

paragraphs 1 through 109 as if fully set forth herein.

163.    As an employer, Wells Fargo owed a duty of care to Plaintiffs and the Class members to adequately train, supervise, oversee, and direct the activities of their employees in connection with the obligations and legal duties of a futures commission merchant.

164.    Wells Fargo also had a duty to adequately train and supervise the employees it sent to LJM's offices on February 6, 2018, to force the liquidation of the Portfolio.

165.    Wells Fargo negligently trained, supervised, directed, and oversaw its employees and permitted them to engage in the immediate bulk sale of E-MINI futures and implement the enforcement of the immediate liquidation of the Portfolio early in the morning on February 6, 2018, destroying the entire value of the Plaintiffs' and Class members' interests therein.

166.    Wells Fargo wrongfully converted the Portfolio Assets and the Plaintiffs' and Class members' interests therein without any legal right to do so.

167.    As a direct, proximate, and foreseeable result of Wells Fargo's negligent supervision of its employees, the negligence caused and resulted in the Plaintiffs' and the Class members' losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for relief and demand Judgment against Defendants, and each of them, at trial and request compensatory damages, together with interest, costs of suit, and all such other relief as this Court deems just and proper.

**JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury

on all issues so triable.

DATED:  February 4, 2022

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:

Mark C. Rifkin (MR-0904)
270 Madison Avenue
9th Floor
New York, NY 10016
(212) 545-4600
rifkin@whafh.com

Kenneth Gilman, Esquire
GILMAN LAW LLP
Beachway Professional Center Tower
8951 Bonita Beach Road, S.E.
Suite 525
Bonita Springs, FL 34135
Telephone: (781) 307-2526
kgilman@gilmanlawllp.com

*Attorneys for Plaintiffs and the Class*