UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

JOSEPH A. KAFKA and TODD KAFKA.,

        Plaintiffs,

     v.                                                     No.  22-CV-1034-LTS

WELLS FARGO SECURITIES, LLC.,

        Defendant.

-------------------------------------------------------------------x

## MEMORANDUM ORDER

        Plaintiffs Joseph A. Kafka and Todd Kafka (collectively, the "Kafkas" or "Plaintiffs") bring this purported class action on behalf of themselves and others similarly situated, against Wells Fargo Securities, LLC ("WFS" or "Defendant"), seeking to recover hundreds of millions of dollars in trading losses suffered by investors in certain investment funds and limited partnerships, to which WFS provided clearing and execution services as a futures commission merchant.  (Docket entry no. 24 ("FAC").)  The Kafkas principally allege that WFS, in response to a temporary market volatility event on February 5, 2018, unlawfully forced the liquidation of an entire portfolio of investments, and plead seventeen causes of action including gross negligence, negligent supervision, tortious interference with contractual and business relations, breach of contract, and aiding and abetting breach of fiduciary duty.

        Before the Court are Defendant's motion to dismiss the FAC (docket entry no. 27) and an alternative motion to strike class claims (docket entry no. 30).  WFS primarily argues that, because it had no customer, contractual, or other relationship with Plaintiffs, and dealt solely with the funds in which they held investments and/or partnership interests, Plaintiffs fail to state a claim for relief as to all counts.  The Court has jurisdiction of this action pursuant to 28 U.S.C.

sections 1332 and 1332(d).  The Court has reviewed carefully the parties' submissions in connection with the instant motions and, for the following reasons, grants Defendant's motion to dismiss in its entirety.

BACKGROUND[1]

The Kafkas bring this action on their own and on behalf of a putative class comprised of all persons who, on February 5 and 6, 2018, held (1) shares in the LJM Preservation and Growth Fund and (2) limited partnership interests in any of the LJM Partnership Funds (collectively, "LJM").[2]  (FAC ¶ 1.)  The former fund was a public mutual fund that invested primarily in call and put options on the Standard & Poor's ("S&P") 500 Futures Index, and the latter funds were organized as Delaware limited partnerships and as commodity pools that traded commodity futures, contracts, and options on futures on various exchanges, including the Chicago Mercantile Exchange ("CME").  (FAC ¶¶ 7, 9.)  To conduct options trading, LJM entered into so-called "Futures and Cleared Swaps Agreements" with WFS, under which WFS was to provide only certain limited non-discretionary and ministerial clearing and execution services as a futures commission merchant ("FCM").[3]  (Id. ¶ 39.)  Plaintiffs attached a copy of

---

[1]   The facts as alleged in the FAC are taken as true for the purposes of the instant motion to dismiss.  Freidus v. Barclays Bank PLC, 734 F.3d 132, 137 (2d Cir. 2013).  This case is related to a dispute between WFS and LJM Investment Fund, L.P. and LJM Partners, LTD, see Wells Fargo Securities, LLC v. LJM Investment Fund, L.P., et al., No. 18-CV-2020 (LTS), that is also pending before the Court.

[2]   The Court refers collectively to all funds in which the Kafkas and purported Class members held investments and/or limited partnership interests as "LJM" for ease of reference, and because the funds' individual identities are not material to the resolution of the instant motion to dismiss.

[3]   The Court reproduces here a useful description of the mechanics of commodity futures trading, written by District Judge Steven C. Seeger:

> A commodity futures contract is an agreement to buy or sell a commodity at a specific price on a specific date.  Each side of the contract basically makes a bet

one such agreement, which was executed on March 16, 2015, to their FAC.  (Id., Ex. A ("FCM Agreement").).  That Agreement expressly disclaims fiduciary duties between the contracting

---

about the future price of a commodity.  Buyers and sellers place their trades through registered brokers [including FCMs] who in turn execute the trades with a futures clearinghouse [such as CME].  See ADM Investor Services, Inc. v. Collins, 515 F.3d 753, 756 (7th Cir. 2008).  The clearinghouse serves as the middleman: it is the buyer to each seller, and the seller to each buyer.  Id.

Commodity futures traders must put money down as a deposit with their brokers.  Known as "margin," this deposit represents "only . . . a fraction of the actual cost on a trade."  Capital Options Investments, Inc. v. Goldberg Bros. Commodities, 958 F.2d 186, 188 (7th Cir. 1992).  "Margins in the futures markets are not down payments like stock margins, but are performance bonds designed to ensure that traders can meet their financial obligations."  See Economic Purpose of Futures Markets and How They Work, U.S. Commodity Futures Trading Commission, https://www.cftc.gov/ConsumerProtection/EducationCenter/economicpurpose.html (last visited Jan. 10, 2020).  Margin helps protect brokers from holding the bag when the traders suffer losses.  See In re MF Global Inc., 531 B.R. 424, 435 (Bankr. S.D.N.Y. 2015) ("Margin is a security deposit to insure that futures commission merchants have adequate customer funds to settle open positions and is required by brokerage houses and exchanges to assure their own financial integrity and the financial integrity of the entire market place.") . . .

Traders can buy positions worth many times more than the margin they have deposited.  But if the value of the positions declines, the broker can demand more margin from the trader to protect itself against the risk of loss.  See ADM Investor Services, 515 F.3d at 756.  Traders must provide enough margin so that "short-term price movement[s]" on the futures contracts won't wipe out their account balances.  Id.  Margin reduces the risk posed by default, particularly given that a "futures contract is executory; no asset changes hands when the contract is formed."  Id. (citation omitted).

The clearinghouse settles the trades between buyers and sellers, and sets the minimum margin requirements for all futures contracts.  Id.  The brokers, in turn, are responsible to the clearinghouse for the trades.  If a trader suffers losses that it cannot pay, the broker must pay the clearinghouse from its own funds.  Id.  ("The futures commission merchant then is on the hook, for it is a condition of participation in these markets that each dealer guarantee customers' trades.").  To protect themselves, brokers enter into contracts with their customers that impose margin requirements and entitle the brokers to liquidate the customers' positions when necessary.

Ironbeam, Inc. v. Papadopoulos, 432 F. Supp. 3d 769, 773-74 (N.D. Ill. 2020).

parties and provides that "[t]here shall be no third-party beneficiaries." (FCM Agreement § 26.)

Although the FAC comprises nearly 300 paragraphs, the relevant facts are straightforward and largely concern events that occurred over a two-day period. On Monday, February 5, 2018, the stock market suffered a steep decline, associated with a "spike" in the volatility index. (FAC ¶ 44.) The Kafkas allege that, for over 20 years preceding this volatility event, LJM had "successfully implemented" various risk management protocols to counter market volatility, such as closing out positions over the course of the day to maintain the "hedged nature" of the portfolio, and they cite an August 2011 incident from which LJM was able to fully recover. (Id. ¶¶ 36, 38.) In line with this approach, on February 5, 2018, LJM responded to the "significant unrealized losses" in its portfolio by executing "risk-reducing trades." (Id. ¶ 47-48.)

The Kafkas claim that WFS knew and acknowledged that its own record of the portfolio accounts was incomplete, to the extent that it "did not reflect the significant reduction of risk exposure that LJM accomplished that day." (Id. ¶¶ 49-50.) Nevertheless, on the evening of February 5, WFS sent a position statement, which allegedly failed to incorporate these risk-reducing trades, and a margin request to LJM. (Id. ¶¶ 53-54.) There is no allegation that LJM supplied the margin payment. Around 6:00 a.m. on February 6, WFS called LJM to provide notice of its intent to terminate the parties' FCM Agreement. (Id. ¶ 56.) Later that morning, WFS sent formal letters terminating its agreements with the various LJM entities, purportedly as of right under section 24 of the agreements, and then demanded that LJM liquidate its portfolio.[4] (Id. ¶¶ 58-59.)

---

[4] The Kafkas allege that the termination was invalid under the plain terms of the FCM Agreements, in that LJM had until the close of the following trading day (February 6) to post the requested margin demand, and that, in any event, termination afforded LJM the option of either closing its positions out or transferring them to another FCM. (FAC ¶¶ 55, 60.)

Plaintiffs allege that WFS' liquidation demand was made purely in its own interest, "not at the instruction of or for the benefit of LJM," nor for the benefit of Plaintiffs and other Class members who were portfolio investors.  (Id. ¶ 62.)  WFS did not stop there; the Kafkas claim that WFS then gave "the extraordinary direction" to LJM to conduct an immediate bulk "short" sale of so-called E-MINI S&P 500 futures, which LJM apparently did not even own and which "could devastate the capital value of the Portfolio" if bought and sold.[5]  (Id. ¶¶ 73-77.)  To enforce the liquidation and "short" sale demands, WFS allegedly sent two of its own employees to LJM's offices in Chicago, Illinois, on February 6; they arrived before the markets opened and stayed until after closing, engaging in a "course of conduct" which resulted in wrongful liquidation.  (Id. ¶ 85.)  By the end of that day, because of WFS' "untimely unauthorized and self-interested instructions," LJM had completely unwound the portfolio, purportedly delivering more than $500 million and as much as $800 million in losses to the Kafkas and other Class members.  (Id. ¶ 89.)

The Kafkas plead 17 counts against WFS: gross negligence (Count One), fraud based on a concealment theory (Count Two), tortious interference with contractual relations (Count Three), tortious interference with business relations (Count Four), negligent supervision (Count Five), breach of contract based on a derivative liability theory (Counts Six, Eight, and Ten), breach of contract as intended third-party beneficiaries (Counts Twelve, Fourteen, and Sixteen), breach of the implied covenant of good faith and fair dealing (Counts Seven, Nine, and

---

[5]  The FAC states that the CME includes among its financial product offerings an E-MINI futures contract; a standard S&P 500 futures contract on the CME is valued at 250 times the value of the S&P 500 Index, while the E-MINI futures contract is 50 times the value of the S&P 500 Index.  (FAC ¶¶ 26, 29.)  The Kafkas claim that, according to LJM, it had previously experimented with trading E-MINI futures on two occasions, both times with negative outcomes, and thereafter ceased trading them.  (Id. ¶ 31.)

Eleven), and aiding and abetting breach of fiduciary duty (Counts Eighteen, Nineteen, and Twenty).[6] WFS moves to dismiss the FAC and, in the alternative, to strike Plaintiffs' class claims.

DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). A complaint cannot simply recite legal conclusions or bare elements of a cause of action; it must plead factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Under the Rule 12(b)(6) standard, the court accepts as true the non-conclusory factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).

The Court addresses each count, or group of substantively similar counts, in turn.[7] Plaintiffs neglected to respond in their opposition papers to WFS' challenges to the fraud claim asserted in Count Two of the FAC. When a plaintiff offers no factual or legal argument in opposition, dismissal is appropriate. See, e.g., Brandon v. City of New York, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (dismissing claims as abandoned where plaintiff "did not raise any arguments opposing Defendants' motion regarding these . . . claims"); Bonilla v. Smithfield

---

[6]   The FAC skips 13, 15, and 17 in its ordinal numbering scheme for the asserted counts.

[7]   The parties do not dispute that, under the relevant choice-of-law analysis, Plaintiffs' tort-based claims are governed by Illinois law, and that, pursuant to the FCM Agreement's choice-of-law provision, Plaintiffs' contract-based claims are governed by New York law. (See docket entry no. 29 at 7, 26 n.7; docket entry no. 33 at 7-21, 22 n.6.) As to the aiding and abetting breach of fiduciary claims, the parties acknowledge that no conflict exists between Illinois and New York law, and therefore a federal court sitting in diversity jurisdiction must apply New York law. (See docket entry no. 29 n.10; docket entry no. 33 at 27 n.8.)

Assoc. LLC, No. 09-CV-1549-DC, 2009 WL 4457304, at *4 (S.D.N.Y. Dec. 4, 2009) (dismissing claims as abandoned where plaintiff "fail[ed] to respond" to defendants' arguments). Count Two is therefore dismissed as abandoned.

Counts 1 and 5: Negligence Claims

### Negligence

The Kafkas first allege that WFS was grossly negligent in ordering the sale of E-MINI futures and forcing the liquidation of the LJM portfolio. WFS counters that it did not owe Plaintiffs a duty of care. (Docket entry no. 29 ("Def. Mem.") at 14-15.) While the parties agree that Illinois law applies to this claim, they dispute whether Illinois law recognizes a standalone claim for gross negligence. (Def. Mem. at 14 n.4; docket entry no. 33 ("Pls. Mem.") at 7 n.1.) WFS argues, correctly, that Illinois law treats gross negligence as an enhanced form of negligence, not as an independent ground for recovery, and Illinois courts construe such a claim as one for ordinary negligence. See Hamilton v. JPMorgan Chase & Co., No. 19-CV-5590, 2020 WL 4586109, at *3 (N.D. Ill. Aug. 10, 2020) (collecting cases). As applied to the facts alleged here, however, this distinction is not meaningful, because Plaintiffs have failed to allege that WFS owed them a duty of care and thus have failed to plead plausibly a cause of action for any type of negligence.

Plaintiffs recognize that the familiar elements of a negligence claim are "that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was a proximate cause of the plaintiff's injury." Doe-3 v. McLean Cty. Unit Dist. No. 5 Bd. of Dirs., 973 N.E.2d 880, 887 (Ill. 2012) (citing Krywin v. Chicago Transit Authority, 938 N.E.2d 440, 446 (Ill. 2010)). In support of the duty element, the Kafkas cite general negligence principles, emphasizing that "if a course of action creates a foreseeable risk of injury, the

individual engaged in that course of action has a duty to protect others from such injury." (Pls. Mem. at 8 (quoting <u>Simpkins v. CSX Transp., Inc.</u>, 965 N.E.2d 1092 (Ill. 2012)).) That argument is both unavailing and unresponsive to WFS' argument, which is that a FCM's duty of care is circumscribed by case law and by federal regulations. In particular, the Illinois Appellate Court has held that "the duty of care owed by a broker carrying a nondiscretionary account is an exceedingly narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer." <u>First Am. Discount Corp. v. Jacobs</u>, 756 N.E.2d 273, 284-85 (Ill. App. 2001); <u>see also</u> <u>id.</u> at 280-83 (discussing rules of the Commodity Futures Trading Commission governing, <u>inter alia</u>, margin and liquidation). To be sure, that formulation of a duty of care applies to a broker (WFS here) carrying a nondiscretionary account for its customer (LJM here), but the Kafkas cite no authority for the proposition that such a duty encompasses the need to protect the customer's <u>investors</u>, let alone extends to all those foreseeably at risk of injury. Nor do they cite a case in which a court has held that an FCM, or a broker generally, has breached a duty owed to its customer's <u>investors</u> by forcing liquidation, demanding a margin payment, or ordering the sale of specific financial products. Indeed, the cases on which the Kafkas purport to rely do not support their theory. <u>See, e.g.</u>, <u>Kolbeck v. LIT Am., Inc.</u>, 923 F. Supp. 557, 572 (S.D.N.Y. 1996) (holding that a "duty of care arises <u>only</u> when the broker does business <u>with</u> the plaintiff") (emphasis added).

Perhaps even more injurious to their negligence claim is the Illinois Supreme Court's holding in <u>Ferentchak v. Village of Frankfort</u>, 475 N.E.2d 822 (Ill. 1985). There, the Court stated that, if a defendant's required "skill and care" is "dependent on his contractual obligation," it follows that the "scope of that duty, although based upon tort rather than contract, is nevertheless defined by the contract." <u>Id.</u> at 826; <u>see also</u> <u>Block v. Lohan Assocs., Inc.</u>, 645

N.E.2d 207, 221 (Ill. App. 1993) ("When negligence is based upon a contractual obligation, the scope of duty is determined by the terms of the contract."). The Kafkas appear to challenge that reasoning by disclaiming any reliance of their negligence claim "upon the terms—or even the existence—of Wells Fargo's FCM Agreements with LJM." (Pls. Mem. at 10.) They insist that, so long as a course of action creates a foreseeable risk of injury to others, a duty arises to protect them from injury. (Id. at 11.) Yet again, however, Plaintiffs fail to cite a case in which a court found that a defendant had a duty of care that extended to third parties and was independent of its duty otherwise demarcated by a governing contract. On the one hand, the Kafkas allege that WFS' and LJM's relationship was formed by the FCM Agreements (FAC ¶ 39), and, on the other hand, they ask the Court to broadly define WFS' associated duties as an FCM to extend to those who only had a relationship with LJM, without considering the "existence" of the FCM Agreements. The Court declines to take that step, and it would be incongruous with controlling case law to do so. The FCM Agreements disclaim any duty running to third parties, and therefore the "scope" of WFS' duty of care as an FCM handling its customers' funds, even if alleged to arise in tort rather than contract, does not include duties to LJM's investors. See Ferentchak, 475 N.E.2d at 826. Where there is no duty, there is no negligence claim, and Count One must be dismissed.

### Negligent Supervision

The Kafkas next allege that WFS negligently supervised the employees it sent to LJM on February 6, 2018, to force LJM to sell off E-MINI futures and liquidate the portfolio during the market disruption. WFS argues that Plaintiffs have failed to satisfy the requisite pleading standard by making only conclusory allegations and that, in any event, their theory in support of the claim is incompatible with its elements. A negligent supervision claim requires a

showing that "(1) the defendant had a duty to supervise the harming party, (2) the defendant negligently supervised the harming party, and (3) such negligence proximately caused the plaintiff's injuries." Doe v. Coe, 135 N.E.3d 1, 15 (Ill. 2019).  As a general matter, under Illinois law, an employer can be liable for its employee's tort in "one of two ways": first, under a theory of vicarious liability, or respondeat superior, if the employee acted within the scope of their employment; or second, in a "direct cause of action" for negligent hiring, supervision, or retention, if the employee acted outside the scope of their employment.  Id. at 12.

WFS' plausibility and incompatibility arguments are that, excepting the lone, conclusory allegation that WFS "permitted [its employees] to engage, outside the scope of their authority" in the forced sale of E-MINI futures and liquidation of the portfolio (FAC ¶ 176), the Complaint consistently alleges that WFS "sent" two of its employees to "enforce its demand" that LJM liquate the portfolio and sell E-MINI futures (id. ¶¶ 85, 101).  The Kafkas respond that Federal Rules of Civil Procedure 8(d)(2) and (3) allow them to plead claims for relief in the alternative.  (Pls. Mem. at 12.)  That argument misses the mark.  While a plaintiff is permitted to plead contradictory claims for relief, a plaintiff must still meet their plausibility burden as to each of the alternative claims.  Here, the Kafkas assert a claim for negligent supervision and, under Illinois law, are required to adequately allege, among other things, that WFS' employees acted outside the scope of their employment.  Doe, 135 N.E.3d at 12, 15.  Instead, Plaintiffs merely restate that particular element of Count Five in the FAC, and the remaining factual allegations assert that WFS' employees acted at the direction of WFS—in other words, within the scope of their employment.  Plaintiffs have clearly failed to meet their plausibility burden, and WFS is correct to note that they cannot rely solely on "magic words without further factual enhancement," Rehabcare Grp. E., Inc. v. CC Care, LLC, 2016 WL 2595108, at *4 (N.D. Ill.

May 4, 2016). Therefore, Count Five must be dismissed.

As Plaintiffs fail to plead plausibly either of their negligence claims, the Court need not and does not address WFS' argument that the claims are further barred by the economic loss doctrine.

Counts 3 and 4: Tortious Interference Claims

The Kafkas allege that WFS, in forcing liquidation, tortiously interfered with Plaintiffs' "subscription contracts and executory investment contracts" with LJM (FAC ¶¶ 154-158), and with Plaintiffs' business relationships with LJM (id. ¶¶ 162-170). WFS argues that both claims fail because (1) Plaintiffs only recite the elements of each claim and do not meet their plausibility burden; (2) WFS' conduct was privileged under Illinois law because it acted to protect its own economic interest; and (3) Plaintiffs have not alleged facts sufficient to establish that WFS intentionally induced LJM's breach of contract with the Kafkas or that it purposefully harmed LJM's business relationship with the Kafkas.

At the outset, the Court notes that "Illinois law recognizes two types of tortious interference claims: (1) tortious interference with contract, and (2) tortious interference with prospective economic advantage." Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc., No. 17-CV-5826, 2023 WL 5334638, at *31 (N.D. Ill. Aug. 18, 2023). Moreover, under Illinois law, "the terms tortious interference with prospective economic advantage, business expectancy, and business relationships are interchangeable." Pampered Chef v. Alexanian, 804 F. Supp. 2d 765, 807 n.30 (N.D. Ill. 2011) (emphasis added). That is, tortious interference with contract concerns a third party's "interference with an existing contract," see Webb v. Frawley, 906 F.3d 569, 577 (7th Cir. 2018), while tortious interference with a business relationship concerns a third party's "interference with a reasonable expectation of a business relationship." See Foster v. Principal

Life Ins. Co., 806 F.3d 967, 971 (7th Cir. 2015). The Court highlights this distinction because, as WFS correctly points out, Plaintiffs do not at any point allege interference with a prospective business relationship. (Def. Mem. 23 n.6; see also generally FAC.) To the extent that the Kafkas claim that WFS interfered with the expectation that their existing business relationships with LJM would continue, that claim is simply duplicative of the tortious interference with contract claim because the Kafkas do not allege a non-contractual business relationship with LJM. See, e.g., Jamaica Citizens Bank, Ltd. v. N. Am. Special Risk Assocs., Inc., No. 96-CV-4203, 1996 WL 648712, at *5 (N.D. Ill. Nov. 1, 1996) (dismissing tortious interference with business relations claim as duplicative when allegations concerned interference with contract). Thus, Plaintiffs' boilerplate allegations that WFS interfered with their business relations with LJM do not meet the requisite plausibility burden for that claim, and Count Four must be dismissed.

To state a claim for tortious interference with contract under Illinois law, a plaintiff must allege facts sufficient to establish: (1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages.[8] Webb, 906 F.3d at 577. The Kafkas fail to allege adequately that WFS acted with the requisite intent. To survive a motion to dismiss, a plaintiff "needs to show that [the defendant] intended to

---

8   Illinois law recognizes a "conditional privilege to interfere with contracts 'where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights.'" Nation v. Am. Cap., Ltd., 682 F.3d 648, 652-53 (7th Cir. 2012) (quoting HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 677 (Ill. 1989)). Contrary to WFS' contention (Def. Mem. at 22 n.5), Illinois law is not clear about whether it is the plaintiff's burden to plead the absence of justification, or the defendant's burden to raise justification as an affirmative defense. Webb, 906 F.3d at 582 (noting that Illinois courts have not provided a definitive answer). In any event, the Court need not address the issue of whether WFS' conduct was privileged because the Kafkas fail to plead facts suggesting that WFS intentionally induced the breach of their contracts with LJM. (See infra.)

cause the breach." Id. at 579 (emphasis added); see also id. ("The essential thing is the intent to cause the result.  If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other." (quoting Restatement (Second) of Torts § 766 cmt. h (Am. Law. Inst. 1979))).  In other words, "knowledge that one's conduct is substantially certain to result in one party breaking its contract with another," does not qualify as intentional inducement.  Id. (quoting R.E. Davis Chem. Corp. v. Diasonics, Inc., 826 F.2d 678, 687 (7th Cir. 1987)).

The Kafkas maintain that they have alleged "in minute-by-minute detail exactly how WFS forced LJM to breach the [subscription agreements and executory investment contracts]" it had with Plaintiffs.  (Pls. Mem. at 17.)  Even drawing all reasonable inferences in the Kafkas' favor, the Court finds that, at most, Plaintiffs allege that WFS knew that its conduct was "substantially certain" to result in the breach of LJM's agreements with third parties.  R.E. Davis Chem. Corp., 826 F.2d at 687.  It is reasonable to infer that ordering the wholesale liquidation of a portfolio would, among other things, injure LJM's investors.  But that showing is insufficient to show WFS possessed the requisite intent under Illinois law.  Apart from conclusory allegations throughout the FAC that regurgitate the elements of a tortious interference claim, the Kafkas nowhere allege that WFS, in forcing liquidation or ordering the sale of E-MINI futures, affirmatively wanted LJM to breach its contracts with the Plaintiffs, or with any of its customers.  Without any factual specifics—i.e., that WFS acted with specific animus, or otherwise singled out Plaintiffs or their contracts—the Kafkas' allegations are simply insufficient to state a claim for interference.  Thus, Count Three must be dismissed.

Counts 6-12, 14 and 16: Contract-Based Claims

Plaintiffs also assert three types of contract-based claims involving the FCM

Agreements across nine counts: (1) breach of contract, based on a derivative liability theory; (2) breach of contract, as intended third-party beneficiaries; and (3) breach of the implied covenant of good faith and fair dealing.  As previously noted, the FCM Agreements between WFS and LJM include a New York choice-of-law provision (see FCM Agreement § 29), and the parties do not dispute that these claims are governed by New York law.

The Kafkas' contract-based claims are without merit.  First, to bring a derivative claim, New York law requires that a plaintiff state with particularity that a demand was made or that doing so would have been futile.  See N.Y. Bus. Corp. Law 626(c) ("In any [derivative] action, the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort."); N.Y. P'ship Law 115-a(3) ("In any [derivative] action, the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the general partner or partners, or the reasons for not making such effort.").  As WFS observes, the point of the demand requirement is "to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs."  Lewis v. Graves, 701 F.2d 245, 247 (2d Cir. 1983) (internal quotation marks omitted).  The Kafkas contend that making such a demand would have been futile because (1) the LJM funds no longer exist, (2) LJM's board and general partner "bear some responsibility for liquidating" the portfolio, and (3) "it is not clear" that LJM is seeking to recover the losses to investors in the Partnerships Funds in the related action that is also pending before this Court.  (Pls. Mem. at 25-26.)  None of these arguments is availing.  A demand is made to the "board" or "general partners," not to the funds themselves, so the funds' insolvency is beside the point.  See N.Y. Bus. Corp. Law 626(c); N.Y. P'ship Law

115-a(3).  More importantly, however, the Kafkas acknowledge that LJM is already litigating a breach of contract counterclaim against WFS in the related action, see Wells Fargo Securities, LLC v. LJM Investment Fund, L.P., et al., No. 18-CV-2020 (LTS).  Because LJM's directors, by virtue of their pending litigation, already "occupy their normal status as conductors of the corporation's affairs," state law prevents shareholders and partnership-holders from bringing a derivative claim for breach of contract.  Lewis, 701 F.2d at 247.

The Kafkas cannot bring a breach of contract claim as intended third-party beneficiaries for the simple reason that the FCM Agreements expressly disclaim the existence of third-party beneficiaries to the contract.  (See FCM Agreement § 26 ("There shall be no third-party beneficiaries.").)  The cases on which Plaintiffs rely for the proposition that "New York courts have looked past the language of the contract to all the circumstances surrounding to determine a party's third-party beneficiary status," did not involve contracts that expressly disclaimed third-party beneficiaries.  (Pls. Mem. at 23.)  "In determining whether a third party was an intended beneficiary to a contract, the actual intent of the parties is critical.  The best evidence of the contracting parties' intent is the language of the agreement itself."  Edge Mgmt. Consulting, Inc. v. Blank, 807 N.Y.S.2d 353, 368-69 (1st Dep't 2006).  Thus, the Court enforces section 26 as written, and the Kafkas may not pursue a third-party beneficiary claim based on breach of the FCM Agreements.  Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 124 (2d Cir. 2005) ("[D]ismissal of a third-party-beneficiary claim is appropriate where the contract rules out any intent to benefit the claimant[.]").

The Kafkas ground their claims for breach of the implied covenant of good faith and fair dealing on their purported third-party-beneficiary status; they recognize that, without that hook, they cannot allege a viable claim for breach of the implied covenant.  (Pls. Mem. at 24; see

also <u>Allenby, LLC v. Credit Suisse, AG</u>, 25 N.Y.S.3d 1, 4 (1st Dep't 2015 ("If there is no contract with [a defendant], there can be no implied covenant claim against it.").) The Kafkas had no contract with WFS, nor are they intended third-party beneficiaries under the contracts between LJM and WFS, and thus any claim for breach of the implied covenant fails.

For the foregoing reasons, Counts Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Fourteen, and Sixteen, which assert various breach of contract claims, must be dismissed.

<u>Counts 18-20: Aiding and Abetting Breach of Fiduciary Duty Claims</u>

Lastly, the Kafkas allege that WFS, in forcing liquidation and ordering sales of E-MINI futures, aided and abetted LJM's breach of its fiduciary duty to Plaintiffs. WFS contends that Plaintiffs' theory of liability is irreconcilable with the premise of an aiding and abetting claim. The Court agrees. Under New York law, to establish a cause of action for aiding and abetting a breach of fiduciary duty, a plaintiff must show: (1) the existence of a violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; (3) substantial assistance by the aider and abettor in the achievement of the primary violation; and (4) damages. See <u>Design Strategy, Inc. v. Davis</u>, 469 F.3d 284, 303 (2d Cir. 2006); <u>Kramer v. Lockwood Pension Serv., Inc.</u>, 653 F. Supp. 2d 354, 380–81 (S.D.N.Y. 2009). A prerequisite to this type of aiding and abetting claim "is an adequately pled claim for the underlying breach of fiduciary duty." <u>Watts v. Jackson Hewitt Tax Serv. Inc.</u>, 675 F. Supp. 2d 274, 280 (E.D.N.Y. 2009) (collecting cases); <u>Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.</u>, 651 F. Supp. 2d 155, 186–87 (S.D.N.Y. 2009) (dismissing similar claim in part because of failure "to adequately plead any other primary violation against defendants or a non-party.")

The Kafkas' theory of liability turns this analysis on its head, as it seeks to comingle the primary violation conduct with the aiding and abetting conduct, and is ultimately,

for purposes of their claim as against WFS, inconsistent with the elements of an aiding and abetting claim. "Substantial assistance" by the aider and abettor "occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." Watts, 675 F. Supp. 2d at 281 (quoting Constantin Assoc. v. Kapetas, No. 601305/2006-BJF, 2007 WL 4294732, at *4 (N.Y. Co. Sup. Ct. Dec. 6, 2007)). Failure to act constitutes substantial assistance only when "the defendant owes a fiduciary duty directly to the plaintiff." United States v. Dist. Council of New York City, No. 90–CV–5722-CSH, 2007 WL 2697135, at *17 (S.D.N.Y. Sept. 17, 2007). The Kafkas do not claim WFS owed them a fiduciary duty, and so they must adequately allege that it either affirmatively assisted or helped conceal LJM's "primary violation." Drawing all reasonable inferences in their favor, Plaintiffs' theory is either (1) that LJM breached its fiduciary duty by giving in to WFS' "demands to liquidate" the portfolio (FAC ¶¶ 89-93), or (2) that LJM agreed with WFS that liquidation was proper (in which case, as WFS notes, it would have been required to execute the trades of its customer as ordered, under the terms of the FCM Agreement). (See docket entry no. 35 at 13.) Neither scenario supports an inference that WFS had "knowledge of" LJM's "primary violation" and then "affirmatively assisted" LJM in committing that violation. Watts, 675 F. Supp. 2d at 280-81. Thus, Counts Eighteen, Nineteen, and Twenty must be dismissed.

<u>Conclusion</u>

For the foregoing reasons, the Court grants the Defendant's motion to dismiss the FAC in its entirety, and denies Defendant's motion to strike class claims as moot. The Clerk of Court is respectfully directed to terminate the motions at docket entry nos. 27 and 30, enter judgment in favor of the Defendants, and close case no. 22-CV-1034.

SO ORDERED.

Dated: New York, New York
September 15, 2023

<u>/s/ Laura Taylor Swain</u><br>
LAURA TAYLOR SWAIN<br>
Chief United States District Judge